This is an information by the Attorney General, against James C. Rories — the clerk of Fayette county court— charging him with misbehavior in office.
The information contains two charges:—
First. That Rodes fraudulently and illegally antedated a marriage license for a contemplated marriage between Bushrod Boswell and Isabella Lowry; that he took no bond, as required by law; and that, afterwards, to avoid a prosecution for official delinquency, he procured a bond to be executed, and fraudulently inserted in it a false date.
Second. That Rodes, as clerk of the county court of Fayette, “did illegally and corruptly demand payment twice for the same services;” that he had, for a series of years, culpably failed to transmit to the clerk of this court, memorials of deeds which had been recorded in his (Rories’) office, and nevertheless corruptly charged the fees allowed for transmission; that he had habitually “split up” services for which the law allowed but one charge, and that he had done so since the first of June, 1830; and that he had been guilty of extortion upon free negroes, by exacting from them illegal charges.
Recital of the evidence as to the marriage license — and conclusion, that,for a dent to antedate an official papei, under any circumstances,is improper, and wholly nn-justitiable — but the charge may be attended by such palliating circumstances [see the text] as will relieve this eourt from the necessity of removing him from office.
Judge Underwood thinks it the imperious dutyof the court to remove a cl ’ll for such an of-fence, committed under any circumstances.
On the trial, upon a plea of not guilty, unusual liber» ality was extended by the court, to. the Commonwealth, as well as to the accused, and much irrelevant testimony was heard. Having patiently and anxiously considered all the facts which could, in any degree, legitimately bear op the case, we shall now proceed to make a final disposition of it, by briefly noticing the effect of the proof as to each of the charges.
I. The evidence sufficiently proved, that the marriage license had been antedated by Rodes, as charged. The marriage was in 1821; the license, as issued, was dated jn 1817. Boswell urged Rodes to antedate the license for the purpose of legitimating (as he seemed to. think such antedating might) the offspring of an illicit intercourse between the parties who were about to intermarry. Rodes objected and hesitated; and expressed the opinion that such an act could have no such effect; but, at last, he yielded, observing that the date of the license, or of the bond, would be immaterial.
The court is not allowed to decide, that no bond was taken at the time when the license was issued. Whether the bond was executed before, or after, the marriage, may be doubted; but we are inclined to the opinion that it was before. It was, however, certainly antedated; though the date of the bond and that of the license do not correspond. The cause of the discrepancy in that particular has not been satisfactorily explained; nor is it material that it should be ascertained.
In thus antedating the license and the bond, the clerk has been guilty of very great indiscretion. Such official falsehood should never be uttered or‘countenanced, and cannot be justified by any circumstance, however importunate, or by any motive, however benevolent or pure. All the circumstances prove satisfactorily that Rodes was not actuated by any sinister or mercenary motive; but was influenced by an innocent belief, that he was doing no essential wrong, arid was prompted only by a generous and accommodating disposition. He knew that the date of the license, or of the bond, was immaterial; because the time of the marriage would be identified by the clergyman’s certificate; and the legal *599 obligation or effect of the bond could not have been affected by its date. No loss or injury, private or public, has resulted, or can ever result, from the false dates of the license and the bond. The clergyman, who was the principal witness for the Commonwealth upon the material allegations in the first charge, swore that he had no other intention than to certify to the clerk, according to law, the marriage, and the true time when it was celebrated.
A marriage license, or bond, is no record.
Neither the license nor the bond is a record; nor was it necessary or proper that either of them.should have been recorded.
Many intelligent and highly respectable witnesses, living in almost every neighborhood in Fayette county, testified, that Rodes is generally, and almost universally, deemed a man of high and unblemished character; that -he is a faithful and obliging officer, and an honorable, kind, amiable man.
Upon these general facts, Judge Underwood is of the opinion, that the official duty of the court requires a judgment of amotion; that no innocence, or generosity of purpose — no purity or excellence, of private character; no propriety or ability, or popularity of general official conduct, can be allowed to palliate the conduct of a clerk who wilfully affixes a false date to a public document. He thinks a clerk ought not to be allowed to decide, whether any mischief may result from his act of misdating papers; and, as he apprehends, that'great and alarming mischief might spring from allowing such an act to be excused, in any case, or under any circumstances, he is of the opinion, that the public interest imperiously requires, that an example should be made of all clerks who shall have thus offended; and that, therefore, it is the duty of this court, on the first charge, to remove Rodes from office.
The Chief Justice and Judge Nicholas do not concur with Judge Underwood. They think that, though no motive, however innocent, should excuse a clerk for a falsification of his records, or for an untrue certification of a matter of record, nevertheless, motive, as well as general character and conduct, should have an important *600 influence in determining the character of such an act as that imputed in the first charge. They think that it is not the duty of this court to remove a clerk from office for every misdemeanor, whatever may be its complexion or its consequences; that it is the duty, as well as the privilege of the court, to exercise a sound, comprehensive and discriminating discretion over that class of offi- , cial lapses and delinquencies which are untinged with impurity, and which do not, by evincing incapacity or corruption, tend directly and essentially to the destruction of public confidence, or the obvious jeopardy of the public security; that the inoffensiveness of the motives which actuated Rodes — the goodness of his proven character in his county — the public opinion of the intelligent community in the bosom of which he has lived and acted ever since he has been its officer, where all his conduct, public and private, has been scrutinized, and where, too, all the circumstances characterizing the official act, proved under the first charge in the information, were most seriously considered and best understood — the lapse of time, during which he seems to have earned a fair name — the death of both Boswell and wife, and perhaps of others, who might have been important witnesses in his behalf: — that all these considerations, when connected with the intrinsic character of the imputed malversation, are justly entitled to great, if not to a decisive influence, on the judgment and discretion of a tribunal, deciding, as a jury, the facts, and adjudging, as a court, the law; whose sentence will be irrevocable and, if condemnatory, fatal and enduring, and from the effects of which- no voice of mercy or of pardon could ever rescue its degraded victim. They think, that the safety of the public has not been endangered by the improper and inadvertent conduct of Rodes (twelve years ago), when that conduct is rightly considered, and his subsequent character, and the confidence of his countrymen in his integrity and official fidelity are also considered; that if he be guilty of no other offence, he may be, as the proof attests that he is, a good clerk and an honest man, notwithstanding the indiscretion of one hasty and unguarded act of his official life; — and that, therefore, *601 neither the interest of the Commonwealth, nor the conscience or duty of this court, requires his removal from office under the first charge. And consequently, in the exercise of what they deem a sound and prudent discretion, they pronounce, as to the first charge, a judgment of acquittal — though not of approval.
Occasional erroneous charges in fee bills, such as other clerks are in the habit of making — do not prove corruption or incapacity in the clerk who issues them. But extortion or incapacity may be inferred where the charges are very exorbitant or habitual_
Though fee bills may appear,upon inspection,to contain illegal charges — as for services unnecessary,andpro-bably never performed,in a case where the penalty, upon conviction,is removal from office, (the records of the court not being used, ta show what orders were made) this court will rather presume, that unnecessary orders,which justify the charges of the clerk, were directed by his court, than, that he made the charges without performing the service. — In the absence of such evidence, (the order books,) the defendant is acquitted of this holding that the office is the recharge,by a majority of the court. — Judge Nicholas dissenting, — and fee bills themselves contain evidence of extortion, for which removal from tjuired penalty.
II. Under the second charge, sundry fee bills were exhibited: some containing charges which, though they are excessive, other clerks are in the habit of making; and some others containing charges which are apparently erroneous. As to the first class, it is the opinion of the whole court, that the erroneousness of some of the charges is insufficient to prove either incapacity or corruption, and that, therefore, such errors would not justify a judgment of amotion. But some of the fee bills of the second class apparently exhibit a signal exemplification of that usplitting up” of orders which it was the object of the act of 1880 to prevent. Fee bills for services of the clerk in the emancipation of slaves, belong to that classification. The following is an example:

"John Skinker (colored man)

To the clerk of Fayette county court, Dr.

3823, April, order on producing deed of emancipation to Jacob, 25,- order acknowledging same, 25 — order to record, 25; recording, 75; order that certificate be granted, 25 — order that he is not likely to become a county charge, 25; order taking description, 25, 25
May — order on producing deed of emancipation to Dór-ela, Sr. 25; order acknowledging the same, 25; order to record, 25; recording, 75; order that certificate be granted, 25; order that she is not likely to become a county charge, 25; order taking description, 25, 2 25
Same for emancipating Dorcia, Jr. except for recording, 1 50

Do. Susan, 1 50

Do. Marshall, 1 50
Do. Nelly, 1 50

Do. John, 1 50

Do. Elizabeth, ■ 1 50
Do. Ben, 1 50
$15 00
J. C. BODES, Clerk.” ■
Thus the round sum of fifteen dollars seems to have been charged for two deeds emancipating the family of *602 a colored man. And charges are made for orders which were unnecessary and unusual.
Where excessive charges are so exorbitant or habit* uaí as to Prove either wantonness or gross ignorance, extortion or incapacity may be the deduction. Of extortion Cohe savs, “it is more odious than robbery; for robbery is apparent and has the face of a crime; but extortion puts on the vizor of virtue — and it is ever accompanied with the grevions sin of perjury.” According to this definition, has Rodes been convicted of extortion?
Judge Nicholas thinks that he has. It is his opinion that the illegality of the fee bills sufficiently appears on their face; that there is no room for fair presumption, that the county court permitted their record to be encumbered with such a number of absurd and unnecessary orders as would be required to legalize some of the fee bills, and that, if Rodes relied on the actual existence of such orders, it was his duty to have produced them. He further thinks that the great number of illegal fee bills proved to have been issued, through a series of years, showing charges of gross and palpable illegality, altogether and always in his own favor, manifest an inexcusable.habit during the time he has been in office; and, therefore, should be deemed sufficient to prevent even mercy itself from putting any other construction upon his conduct than that of deliberate extortion, for for which he ought to he removed.
•Upon the second charge, the Chief Justice and Judge Underwood do not concur with Judge Nicholas. They cannot come to a satisfactory conclusion as to the true character of the principal fee hills, without knowing the amount of service which was actually rendered by the clerk. If they should presume that, in many of the cases in which fee bills were issued, no other orders were made by the court, and entered by the clerk on the order book, than such as were necessary and appropriate, they could not doubt, that the charges were grossly illegal. Rut unnecessary orders may have been made by the court, and entered in an unusual and subdivided manner; and if such orders were made, in such *603 a form, the clerk had a right to charge for them, as made and entered. They admit, that it may be presumed, that no unnecessary orders were made by the court, and that entire orders were not subdivided on the order book. But it is also reasonable to presume, that the clerk did not violate his official duty wilfully, by charging for orders that had never been made. The clerk, or the court, has erred; but whether the error was in the one or the other, no proof in this case enables this court to determine. It was incumbent on the Commonwealth to support her specifications by sufficient proofs. It was not the duty of the clerk to prove his innocence, until sufficient evidence had been produced by the Commonwealth to authorize the inference of his guilt, in the absence of countervailing evidence. He is not guilty unless his charges were unauthorized- and- clearly illegal. They should not be presumed to have been so — they cannot have been so, unless they are contradicted by the record; and this court cannot know, and should not, in a case so highly penal as this, presume that the fee bills and the records do not correspond.
Had the order books been produced, and had they shewn, that the clerk had charged lor orders that had never been made, Judge Underwood would have decided that the second charge had been supported, sufficiently to require removal on that ground. He, also, is of the. opinion, that none of the bundles of fee bills were legal evidence against Rodes, except such as were described in the specifications.
The Chief Justice is inclined to the opinion, that, admitting the illegality of some of the items in many of the fee bills, all the proof upon the second charge would not, when properly considered, be sufficient to convict Rodes of such incapacity, or extortion, as would require his removal from office by the judgment of this court. Here again he thinks that the imposing testimonials which have been given of his good character, and of his general fidelity and rectitude as an officer, should have great effect. Such proof tends to impart the corn, plexion of innocence, mistake, or inadvertence, to acts which, otherwise, might appear to be dark and even *604 -criminal; and it should, as he thinks, have some influence in characterizing the conduct'of Rodes.
Upon the trial ofa clerk,uuless a majority ofthe judges concur, aswell as to the cause for which he should be removed, as in the proprietyofsuch a sentence upon the whole case, he must be. acquitted.
A majority of the court is of opinion, therefore, that the second charge has not been satisfactorily sustained.
Wherefore, as a'majority of the court concurs in the opinion, that removal from office ought not to be adjudged ón either of the charges preferred in the information, a judgment oDacquittal is the consequence of the various opinions ofthe several members of the court.
And, therefore, it is adjudged and ordered, that James C. Rodes be acquitted of the charges which have been preferred against him, as the dork of the county court of Fayette. \