COMMONWEALTH
*vs*
RODES.

---

## Commonwealth of Kentucky *vs* James C. Rodes, Clerk of the Fayette County Court.

INFORMATION FOR REMOVING SAID RODES FROM OFFICE.

*Clerks.    Embezzlement of public moneys.    Extortion. Making false entries.*

CHIEF JUSTICE EWING delivered the opinion of the Court.

*Case* 35

6bm171
j 110 540
j 110 541

6bm171
116 751

*Oct.* 14.

6bm171
116 751

Classification of the charges.

THIS is an information filed by the Attorney General, in the name and behalf of the Commonwealth, against James C. Rodes, for misbehavior in office as the Clerk of the Fayette County Court. The charges made may be classified under three distinct heads: 1st. Embezzlement, 2d. Extortion; and 3d. Entering a false entry on the order book, without and against the order and directions of the County Court.

I. Under the first general charge there are six specifications of a false and fraudulent failure to report to and account with the Auditor of Public Accounts, for sums of money received as revenue, on licenses issued for standing studs, jacks, and bulls, and for the exhibition of menageries and circuses, and for theatrical performances in the said county, and for taxes received on deeds recorded, with a precise specification of the year, item of taxes received, and persons from whom received, and the amount withheld from the Auditor in each year, from 1835 up to 1840. The proof is clear in support of this charge: 1st. That he reported to the Auditor as revenue received by him for licenses issued for studs, jacks, and bulls, from the 1st November, 1835 to the 1st November, 1836, only the sum of $613, when his own account book, (and from which he must have made his report to the Auditor,) and his deputy's report to the September Circuit Court, both show the true amount received to be $630 50,

1st specification under 1st charge of embezzlement of public moneys—failing to account with the Auditor for public moneys received as revenue in 1835.

making a difference of $17 50, which he failed to report and account for to the Auditor.

2d. That from the 1st November, 1836, to 1st. November, 1837. be reported to the Auditor, in gross only the sum of $428, as received on licenses to stand studs, &c. when he had received in addition thereto $78 more, which he did not report or account for; and afterwards, under the instructions of the Attorney General, being required to report the items and names from whom received, he again left out and failed to report the $78 aforesaid. And it appears further, that the items reported, exclusive of the $78, upon being correctly added up, amounted to the sum of $478 instead of $428, reported to the Auditor; yet they are cast up and reported by the defendant at $428 only in the second report, making a difference of $50 received and not reported, in addition to the $78 not embraced in either report. But this error in the addition not being specifically charged in the information, is noticed only as a fact bearing incidentally upon the charges specifically made. It further appears that a report was made by the defendant's deputy, to the March and September terms of the Circuit Court, as required by law, to be laid before the grand jury, embracing the items and names from whom the $78 was received, and a report was made to the June term of the. Court by the defendant, omitting those items, and in consequence of their omission three several indictments were found against the owners of the studs, &c., for standing without licenses, as to $66 of the amount, which were afterwards, upon the production of the licences duly issued by the Clerk, discharged, and the defendant called before the Court, on motion by the Attorney for the Commonwealth, to show cause why he should not be fined for his false report, and upon hearing his excuse, (the sickness of his deputy who had kept the accounts,) he was permitted to amend his report and dischaaged.

3rd. That from the 1st of December. 1838, to the 1st of December, 1839, he reported and accounted for only $859, for studs, &c., and he collected the further sum of $50 from John G. Dunn, which is charged on his account book, and reported by his deputy to the September term

of the Circuit Court, 1839, but omitted by the defendant in his report to the County Court and to the Auditor.

COMMONWEALTH
vs
RODES.

4th. That from the 1st of December, 1839, to the 1st of December, 1840, he reported and accounted for $453 only, omitting the further sum of $14, viz: $4 received from Edward Bowman and $10 from David Watts, which stands charged on his account book. This latter report seems to have been made by a new deputy, before he had been qualified as such.

4th specification, for failing to account for public moneys received from 1st Dec. 1839, to 1st Dec. 1840.

5th. That he collected in 1838, of Waring, &c. for menagerie and circus, $20 ; of Scott & Thorn for theatrical exhibition, $10; of F. A. Drake for same, $10, and of S. P. Stickney for circus, $10, making in all $50, which he failed to report or account for, though these items are found on his book, and were reported by his deputy to the September term of the Fayette Circuit Court, 1838, a short time preceding the defendant's report to the Auditor in December.

5th specification, for failing to account for public moneys received for licenses to menageries, circus shows, &c. in 1838.

6th. That he failed to report or account for taxes received on deeds from the 16th of September, 1839, until the 1st of December next thereafter, during which time there was thirteen deeds recorded, and the tax may have been received on others subsequently spread on the record.

6th specification, for failing to account for taxes received on deeds from 16th Sept. to 1st Dec. 1839.

It is made perfectly manifest from proof, that the defendant, in every year, for five successive years, commencing in 1835, has been in default and failed to report and account for correctly, the public moneys received by him, but in each and every year has retained and applied to his own use, the different amounts received by him as before shown, contrary to his sworn duty as Clerk. From such habitual defalcation, the presumption must be indulged, that the omissions have been the result of sinister purpose and design, which presumption must stand in full force until it is repelled by countervailing circumstances. This the counsel for the defendant has attempted to do, by ascribing to inadvertence, errors, and mistakes, the common effect of human frailty, the omissions shown. By the exercise of the slightest and most ordinary care and vigilance in the discharge of the duties enjoined on him by law, these errors could not have occurred. He

is required by law, to keep a list of the amounts of moneys received. Had that list been kept in proper form, and the sums set down as received, with the slightest care and attention to the duties imposed on him as a public officer, he could not have erred unintentionally in making his reports to the Auditor. And if an error might have occurred once or twice, and at remote periods from each other, the idea cannot be indulged, that they would have occurred, with an officer worthy to be trusted, in six successive reports to the Auditor.

Gross negligence in the discharge of a fiduciary trust, is evidence of fraud. And the excuse relied on by the defendant's counsel for his defalcation, is made to rest upon the concession of the most palpable and reckless negligence, which in itself, amounts to misbehavior in office.

Gross negligence in the discharge of a fiduciary trust is evidence of fraud and misbehavior in office.

Some of the items omitted are found upon the very account book from which he copied his report to the Auditor. These omissions we are required to ascribe to oversight. By an inspection of the account book and the items found charged in the same, we are satisfied that they could not have been overlooked by an officer having the slightest regard for the faithful discharge of his duties, by the exercise of the most ordinary care and attention. Others for shows and theatrical exhibitions, are found divided and charged in unusual places in the account book, one portion in the fore part and another in the back part of the book, and not under or appertenant to the account of taxes for the year. One of these portions is charged by his deputy and another by himself, and both are entirely omitted in his report to the Auditor. If regardful of his duty as a faithful officer, he would have placed and caused them to be placed on his book where they could not have been overlooked. If placing his account of portions of the public moneys received in secret and unusual places on his book, could be allowed by this Court to exonerate the defendant from a fraudulent purpose or design in omitting to report the items so charged, it would be very easy for every Clerk in the State, who intended to cheat the Commonwealth out of a portion of the public dues, so to charge his accounts, or that portion

intended to be withheld, as to escape from all responsi-
bility in case of discovery.  We cannot sanction such
an excuse.

Other items, and especially a portion of the $78 which
he omitted to report and account for in the year 1837,
was not charged in his book.  The omission to charge
the same amounted to the grossest negligence and disre-
gard of a legal injunction on the part of himself or de-
puty, or both.  And if the omission, under the circum-
stances, might be excused, the proceedings upon the faith
of his erroneous report to the June term of the Circuit
Court, whereby three indictments were found against citi-
zens of the county, who held licenses in their hands, and
the further proceedings against himself, whereby he was
permitted to correct his report and to excuse himself on
the ground that his deputy was sick, and the items not
found charged on his book, should have impelled him,
had he not been wrecklessly regardless of his duty, to
an immediate correction and charge of the items on his
books, so as to avoid a similar error in his report to the
Auditor.  And if this were neglected, it would seem that
the circumstances attending the proceedings were such,
if he were not heedlessly regardless of his duty, to im-
press upon his recollection the items thus omitted when
he made his report to the Auditor the fall following, and re-
newed the same, designating the items and names in the
summer of the next year.

Nor will the publicity of the proceedings in relation to
those items, satisfactorily repel the presumption of pur-
pose and design, in omitting them in his report to the
Auditor.  His first report contained only the gross sum
received upon licenses to stand studs, &c. and by an in-
spection of the report, no one could have ascertained
whether the items were omitted or not.  And though his
second report, made in the following summer, contained
the items and names from whom received, he might have
well reposed in security, that no person at so distant a
day after the proceedings were had, would look into and
inspect his report to the Auditor. to ascertain whether
those items were omitted.  Indeed it might well have
been presumed, if a thought at that distant day was exer-

COMMONWEALTH
*vs*
RODES.

cised about it, by any person who was present, that those would have been the last items omitted if the defendant felt disposed to cheat the Commonwealth out of any of her dues, and on that ground he might well have supposed that enquiry would have been suppressed.

Nor is it any excuse, that the defendant in those years, was absent much of his time, in winding up the estate of his father, and the accounts were mainly kept by his brother, who was his deputy. If that were the case, and he felt the slightest regard, and desire to report truly the amounts received, and to retain and apply to his own use, no part of the money due the Treasury, he would have called in the assistance of his deputy, (who seems never to have erred in making his reports to the Circuit Court,) in making his reports to the Auditor. Nor does the smallness of the amounts abstracted from year to year, constitute any justification for the defalcation; nor does it authorize any other than a very slight presumption, that the defalcations were not intended. Small amounts abstracted from year to year, for several years, may amount to a sum worth retaining. Had a large sum been withheld, it might, and most likely would, have excited suspicion, and led to inquiry and detection, whereas small sums withheld from time to time, might escape observation. And it appears in this case, that his escape from detection in the first false report, most likely led the very next year to a much larger and more palpable error.

Upon the whole, having due regard to the public service, we are constrained to the conclusion, that the habitual defalcation exhibited by the facts established, authorize and require the presumption, that the sums retained and not accounted for, were retained for sinister and selfish purposes, and his gross and unscrupulous neligences in keeping his accounts and making his reports, instead of rebutting the presumption, add to the strength, and so far from operating as an excuse, manifests his unworthiness to be longer trusted as a public officer.

*Habitually neglecting to account for small sums as a public officer, authorize the presumption that sinister views induced their retention—or a continued or gross negligence which is inexcusable.*

II. The defendant is charged also, with extortion, in the wilful exaction under color of his office as Clerk, of illegal and double fees for services rendered, and fees for

*Specification under the second general charge of*

services pretended to be rendered, which never were ren-
dered.

Under this charge there are numerous specifications,
which may be classed under three distinct heads: 1. In the
exaction of illegal fees from persons of color for services
rendered and pretended to be rendered in their emancipa-
tion. 2d. In the exaction of illegal fees for services ren-
dered and pretended to be rendered in binding out ap-
prentices under the order of the County Court. And 3d.
In the exaction of illegal and unauthorized fees in other
cases. We will give a copy of the order and fee bills,
where fee bills have been issued, in each of those three
classes of cases, under their proper heads, as specimens
of the services rendered and fees exacted in each case.

And 1st. There are forty cases of orders for certificates
of emancipation, in favor of persons of color, in which
class of cases we copy the following as a specimen of
the orders made:

"A deed of emancipation from L. Combs to Sarah,
was produced in open Court, and acknowledged and or-
dered to be recorded. It appearing to the Court that said
Sarah was likely to become a county charge, it is order-
ed that said Combs execute bond in the penal sum of
$300, with John M. McCalla his security, conditioned
that said Sarah shall not become a county charge, who
executed said bond accordingly; it is ordered that certifi-
cate of emancipation be, and the same is hereby grant-
ed her; said Sarah is about 65 years of age, about five
feet six or eight inches high, and of brown black color."

For this order, the preparation of the bond, and issu-
ing the certificate of emancipation, with all the services
connected with it, and in all similar cases, the defendant
has been in the habit of charging from four to four and a
half dollars in each case. No fee bills in this class of
cases are produced, and it seems that none have been is-
sued by him since 1833, when he was before tried by this
Court, and his fee bills in emancipation cases severely
condemned, which case is reported in 1 *Dana*, 601. Nor
has he, since that time, charged the fees in those cases
on his fee book, though he was in the habit, previously to
that time, of issuing fee bills against the emancipator, and

COMMONWEALTH
*vs*
RODES.

extortion, in ex-
acting     illegal
fees from, &c.

Order of Court
the basis of a
fee bill.

COMMONWEALTH *vs* RODES.

charging the same to him on his fee book, as was and is still his habit in all other cases. But since that time his unvarying practice has been to exact the fees from the person emancipated, and to refuse the certificate of freedom until the fees are paid.

But though no fee bill has been issued nor charge found on his fee book, his rates and mode of charging are shown by his instructions to his former deputy, and the proof of his present deputy, exemplified by a fee bill made out, varying only from each other in this particular, that his instructions to his first deputy contained one order less than the fee bill made out by his present Deputy, but contained a charge of 75 cents for recording the deed or paper of emancipation in his deed book, which is proven to be his practice to do, by his present deputy. Those rates are as follows:

Fees charged by defendant in cases of such orders.

*First Deputy.*

| | | |
|---|---|---|
| Order proved, | $  25 | cents. |
| Order for bond, | 25 | cents. |
| Bond, | 50 | cents. |
| Order certificate, | 25 | cents. |
| Order description, | 25 | cents. |
| Record deed of emancipation, | 75 | cents. |
| Copy, | 83 | cents. |
| County seal, | 1 00 | |
| Two certificates, one for himself and one for presiding Justice, | 50 | cents. |
| Total, | $4 58 | cents. |

*Present Deputy.*

| | | |
|---|---|---|
| Order acknowl'ing deed of emancipation, | 25 | cents. |
| Order certificate to issue, | 25 | cents. |
| Order for bond, | 25 | cents. |
| Order bond executed, | 25 | cents. |
| Bond, | 50 | cents. |
| Order description, | 25 | cents. |
| Certificate and seal, | $1 00 | . |
| Clerk and Justices certificate 25 cts. each | 50 | cents. |
| Issuing certificate, | 83 | cents. |
| Total, | $4 08 | cents. |

The following, according to our interpretation of the statutes, are the only properly legal charges which can be made in such case:

| | |
|---|---:|
| For the entire order or entry | 25 cents. |
| Bond, | 33 cents. |
| Certificate with county seal annexed, | 83 cents. |
| Oath to witnesses, if the deed is proved, | 18 cents. |
| Tax on county seal, | 50 cents. |
| And if the deed or paper of emancipation be spread at large upon the order book, one and a half cents for every twenty words, which in deeds of the medium length would not exceed six cents, | 6 cents. |
| | $2 15 cents. |

There might be some plausible pretext for charging for

| | |
|---|---:|
| an additional order requiring bond, | 25 cents. |
| And for copying and certifying the description of the person emancipated, it being required by a subsequent statute to the one fixing the fee originally for the certificate, | 18 cents |
| And for recording the deed in the order or deed book, where an order requiring it to be done had been made, | 75 cents. |

in analogy to the fee allowed for recording deeds of conveyance of a slave. But we are satisfied, in strict legal propriety, that none of these charges ought to be made.

The statute of 1828, (1 *Stat. Laws*, 685,) expressly provides for "every order of Court in the management of causes, *counting the whole entry one order, and not including any entry required by law, for which a fee is specially allowed*, a fee of 25 cents only. Though this enactment relates to the fees of the Circuit Court Clerks, there being no fee for the order, in the case under consideration, allowed to the County Court Clerks, but he being allowed, by a provision of the same statute, (1 *Stat. Laws*, 689,) to charge the same fees, for services of the *same nature allowed* to Circuit Court Clerks, he is entitled to the same fees for the order, but subject to the like limitation and restriction. And by the statute of 1830, (1 *Stat. Laws*, 404,) the practice of splitting up

County Court Clerks are allowed to charge the same fees as are allowed to Clerks of the Circuit Court, where none is specifically fixed by law.

COMMONWEALTH
*vs*
RODES.

and dividing orders and services, and charging double fees for the same, is denounced as a high misdemeanor in the Clerk so offending, and in addition to the penalties imposed by existing statutes, is made an indictable offence, and the record of conviction made *prima facie* evidence of guilt, in a proceeding to remove him from office.

In the construction of these statutes, we think that the order in question amounts only to a single entry, and for which the single charge of 25 cents only is allowable. It is a connected and continuous entry, made upon the same motion, and necessary to the obtainment of one single object, the certificate of emancipation. And all the orders prior to the final order for a certificate of freedom, are no more than preparatory steps to that end. Either or all of them together, would not accomplish that object without the final order, nor could the final order be properly made without showing and noting those previous steps. The entry noting the proof of the deed, the entry for bond to be given or not given, the entry describing the person emancipated, and entry approving the bond, would all jointly or separately, amount to nothing in the accomplishment of the object intended, and if made separately and at the same time, would seem to be unmeaning, and would be certainly incomplete in the attainment of the end intended. The *whole entry*, therefore, in the language of the statute, *should be counted as one order*.

But though the statute of 1828, *supra,* allows only 25 cents for one entry, it excepts cases in which matters may be noted and embraced, for which a specific fee may be allowed, and under this exception, in cases where it is necessary to swear witnesses to prove the deed, he is entitled to 18 cents, a specific fee being allowed for such service. And under the same exception, if he copies the deed at large on the order book, he may be entitled to 1½ cents for every twenty words, the Circuit Court Clerk being allowed at that rate for recording the reports of surveyors, auditors, &c. and for recording the return on a writ of ellegit, and the service of *recording* a deed or paper of emancipation being of the same nature.

The order in cases of acknowledging deeds of emancipation in Court, is 25 cts. but if witnesses are sworn and it is proved, 18 cts. more.

Copying the deed upon the record, where expressly ordered 1 1-2 cts. for every 20 words.

We know of no law requiring a deed of emancipation to be recorded, nor is there any law giving a specific fee for such service. It is not a deed of conveyance, within the contemplation of the acts requiring such deeds to be recorded. Nor does one of the main purposes in requiring such deeds to be recorded, the safety of creditors and purchasers, apply to deeds of emancipation. Nor is it necessary to record them for the purpose of preservation, as the certificate of emancipation is made evidence of the right to freedom, and if lost or destroyed may be supplied by another from the order book. Indeed, since the statute of 1800, (1 *Stat. Laws*, 609,) a slave may be emancipated by any executed instrument of writing, even without a seal. So that now, the writing entitling the slave to his freedom, may not be entitled to the name or dignity of a *deed*. But whether it has or has not a seal, it has none of the characteristics of a deed of conveyance, and none of the purposes for which such deeds are required to be recorded, applies to such a deed or paper. And if it is recorded in the deed book, there being no authority for recording, its record would avail nothing, as a certified copy could not be used as evidence of its authenticity. It may be proper, and is no doubt the better practice, as the means of identifying the deed or paper proved, and preserving it as the bases upon which the order for a certificate rests, to spread it at large on the order book; and for such service the Clerk may be allowed to charge 1½ cents for every twenty words, as before indicated, but is certainly entitled to no more. Nor can the order of the Court requiring him to record it, if even the order is to be understood as requiring it to be recorded in the deed book, entitle the Clerk to a specific fee of 75 cents for recording it, when no such fee is allowed by law. But as the order might be legally and properly made requiring it to be recorded on their order book, the order should, perhaps, be so understood, and had the same been done, the Clerk might have charged the fee of 1½ cents as intimated.

As there is no specific fee for the bond required to be executed, against the person emancipated becoming a charge to the county, the Clerk has a right to charge for

COMMONWEALTH
*vs*
RODES.

No statute requiring deeds of emancipation to be recorded, and a certified copy from a deed book would not be evidence.

For taking bond of the emancipator of a slave, 33 cents is the legal fee.

COMMONWEALTH
*vs*
RODES.

The fee of a
Clerk for prepar-
ing a certificate
of emancipation
on parchment,
and fixing the
county seal, is
five shillings,
statute 1798.

preparing the bond, under the provisions of the statute of 1828, above referred to, the same fee allowed to Circuit Court Clerks for preparing bonds of a similar nature, which we have fixed at 33 cents, the fee allowed for preparing injunction and appeal bonds.

The statute of 1798, (1 *Stat. Laws*, 608,) after directing the mode of proof, &c. of deeds of emancipation, provides "that every slave so emancipated, shall have a certificate of his freedom from the Clerk, on parchment, with the county seal affixed thereto, for which the Clerk shall charge the emancipator five shillings." We understand the statute as entitling the Clerk to the five shillings, or 83 cents, as his fee for the whole service in preparing the certificate on parchment, and *affixing the county seal* thereto. But this was intended for his *individual service*, and did not embrace the tax fee to the State, if such tax was at that time intended to be charged when affixed to such a certificate. Though the subsequent statute of 1828, *supra*, allows 50 cents to Clerks for affixing the seal of office, and certificate accompanying the same, we do not understand this provision to change, modify or repeal the former law, allowing the specific fee of five shillings for the *whole* service therein required, including the *affixing* of the seal, nor intended to allow the 50 cents as an *additional fee* to that which had been fixed for that specific service; but the latter statute was intended only to apply to such other cases as might require the certificate of the Clerk under his seal of office, and for which service the fee had not been specifically fixed by law.

By the statute of
1799, 50 cents
tax is allowed
for affixing the
seal of the Coun-
ty Court.

No fee is charg-
able as Clerk, for
a description of
a slave emanci-
pated; nor for
copying the deed
or the certificate
of freedom; nor

But though the first statute might not have contemplated a tax fee to the State by a subsequent statute, (2 *Stat. Laws*, 1366,) a tax fee of 50 cents is expressly required on the seal of any *County Court*, and no exception is made where the seal shall be affixed to a certificate of emancipation. We think, therefore, the tax fee is properly demandable by the Clerk, and it is his duty to demand and account for it to the Treasury. Though since the statute of 1798, above quoted, which allows five shillings for the seal and certificate on parchment, the additional duty is required of giving a description of the slave emancipated, in the order and certificate, as no addition-

al fees have been allowed for this service, he has no right to charge any, nor has he a right to make any additional charge for copying the deed on the certificate of freedom, as the copy composes a part of the order, if copied on the order book, and as such, is a component part of the certificate, and for which a specific fee is allowed, whether the certificate be long or short.  Nor has the Clerk a right to charge, in addition to the fee so fixed, a fee for the presiding Justice's certificate, or for his own certificate that he is the presiding Justice.  The presiding Justice's certificate is sufficient, under the act of Congress, (1 *Stat. Laws*, 189,) if the slave desired to use his certificate in any other State, and it was unnecessary if he did not intend so to use it; and if any person was entitled to a fee for it, it would be the Justice, and not the Clerk; but even the Justice is not entitled to a fee, and the addition of the Clerk's certificate was wholly unnecessary, and unless it was required, he had no right to make it, or exact for it a fee from the person emancipated.

It will be perceived, from what has been said, that nearly half of the fees charged and exacted from this ignorant class of the community, in the forty cases exhibited, were illegal, and many of them palpably erroneous and without color of authority.

2d.  There are a number of cases in the second class of cases, which we have not stopped to enumerate, of which the following is a specimen of the order and fee bill of the defendant:

"*January Court*, 1841.

"Franklin Cunningham, aged 17 years this month, (infant son of Jacob Cunningham, who resides out of this county,) is bound apprentice to his brother, William H. Cunningham, until he is twenty-one years of age, to learn the trade of farmer, as per certificate of his father herewith filed.  Indentures acknowledged, and ordered to be recorded."

*Fee Bill in the case.*

"1841.  WILLIAM H. CUNNINGHAM,

"*To the Clerk of the Fayette County Court,      Dr.*

"To order binding Franklin Cunningham to you, 25 cents; indenture, 50 cents; recording same, 50 cents;

COMMONWEALTH
*vs*
RODES.

for writing the certificate of presiding Justice

Order binding apprentice.

The fee bill of defendant therefor.

order to record, 25 cents; order consent of his father, as per certificate filed, 25 cents—total $1 75."

25 cents is the legal fee for an order to bind apprentice.

It is obvious from what has been said in relation to the order for emancipation, that this entry is one *entire entry*, and leading to the same end and object, the binding the apprentice, and for which a single fee of 25 cents only is allowable.

We will also copy another order and fee bill on this subject, indicating the defendant's wreckless disregard of the law in his unscrupulous exactions.

"*May Court*, 1842.

"John Harvey, who was 18 years of age 22d day of February last, is bound apprentice to Nicholas Morgan, until he arrives at the age of twenty-one years, to learn the trade of blacksmith, his uncle, John Harvey, as his next friend, appearing in Court and consenting thereto. It also appearing to the Court that said boy had no father, and that his mother resides in Pennsylvania."

*Fee Bill.*

"MAY, 1842.   NICHOLAS MORGAN,

"*To the Clerk of the Fayette County Court,        Dr.*

The fee of defendant for order to bind out apprentice.

"To order binding John Harvey to you, 25 cents; indenture. 50 cents; recording same, 50 cents; order to record, 25 cents; order consent of his next friend, 25 cents; order boy has no father, 25 cents, and that his mother lived in Pennsylvania—$2 00."

We would further remark, in relation to the fee bills in this class of cases, that it appeared in proof that the defendant had printed forms of indenture, in a book bound in paper, which being filled up, are signed and sealed by himself as Clerk and the person to whom the apprentice is bound and; the indenture is not copied or recorded in any other book, yet in every instance he has charged and exacted a fee of 50 cents for the indenture, and 50 cents for *recording* the same. The fee for recording is unauthorized and illegal, the service never having been performed.

3d. In the third class of cases there are numerous orders and fee bills on different subjects exhibited, in all of which, without scarcely an exception, there are errors and overcharges, and in the most of them grossly palpable

errors, manifesting a wilful and perverse disregard of the statutes. We will content ourselves with copying only a few of them. And first, in the case of J. G. Boswell and others, at the April term, 1842, the following order is made in substance:

"On motion of Jos. G. Boswell" (and others named,) against John W. Craig and wife, (and others (named,) as Commissioners to divide a lot of land, (described,) it is ordered, that said Commissioners make report of the division they may have made of said land, at the next term of this Court, and also a deed of conveyance to said Craig and wife, for their portion of said lot, Danl. Bradford, Esq. dissenting. The words, said Craig and wife, erased by order of the Court."

The order, as first written, had the words "Craig and wife," preceding the word Commissioners, and being an error in the entry, the words "Craig and wife" were erased under an order of the Court.

And on the same day the following order was made:

"On motion of Jos. G. Boswell (and others, named,) to set aside and quash a deed from the standing Commissioners, to Laura Craig, for a lot of ground, (describing it,) which being fully heard, was overruled. To which said Jos. G. Boswell, &c. by their attorney, except, and time is given them till next Court to file their bill of exceptions."

*The fee bill for both orders.*

"April, 1842. Joseph G. Boswell, *et al.*

"*To the Clerk of the Fayette County Court,    Dr.*

"To order on motion to divide lot of land in the City of Lexington, 25 cents; order Commissioners to report, 25 cents; order to Commissioners to make conveyance to Craig and wife, 25 cents; erasure made by the direction of the Court, 25 cents; order one Justice dissenting, 25 cents; order on motion to quash deed Commissioners to Laura Craig, 25 cents; order overruling same, 25 cents; order exceptions, 25 cents; order time given to file them, 25 cents—$2 25."

It is manifest from what has been before remarked, that there are but two continuous entries, and that the fee for every item charged is erroneous and unauthorized. except two of 25 cents each; and that consequently the defend-

**[Margin notes:]**

COMMONWEALTH *vs* RODES.

Order of County Court for division of land, and to set aside a deed.

Fee bill of def't therefor.

Fese of Clerks for an order for report of a division of land, 25 cents; order to set aside same, 25 cents.

Example of split-
ting up orders
improperly, and
charges by def't.

ant has charged more than four times the amount that he
was legally entitled to.

In the case of a motion by Wm. G. Dunlap, for the ap-
pointment of Commissioners to view a way for a private
passway, to run through the lands of Jouitt, McCalla and
others, and report thereon, notice having been given to
each of the persons named, which is noted as filed, and
a copy of the order allowed to be taken out immediately,
there are three charges of 25 cents each for the entry, one
for the viewers, one for notice, and one for copy to be ta-
ken out, all of which but one, are clearly erroneous.

In the case of M. Flournoy's will, which was proven
and ordered to record at the June term, 1842, without
contest, for the probate and order to record, and qualifica-
tion and bond with sureties, by consent in writing of his
legatees, proven and filed, the following charges are
made :

The fees of a
Clerk for receiv-
ing in Court
proof of a will,
is 33 cents, and
taking bond 40
cents ; swearing
witnesses to
prove a writing
on the occasion
is 18 cents in ad-
dition.

For the probate 33 cents ; order executors qualified, 18
cents ; bond 40 cents ; order approving security, 25 cents ;
order consent of legatees, 25 cents ; order proof of con-
sent, 25 cents ; all of which charges are illegal and un-
authorized, except the two items of 33 and 40 cents, and
18 cents in addition thereto for swearing the witnesses to
prove the written assent of the legatees, and noting the
same.     There are many cases of similar illegal charges,
in cases of the probate of wills, and the granting of letters
of administration.

Defendant's fees
charged in an ap-
peal case mostly
unauthorized.

In the case of David A. Sayre, *ads.* Wallace, at the
May Court, 1833, on an appeal to the County Court, in
which the judgment of the Justice is affirmed, and costs
awarded the appellee Sayre, the defendant has charged
him for entering attorney, 8 cents ; docket 8 cents ; order
of hearing, 25 cents ; trial 75 cents ; order affirming judg-
ment, 25 cents ; judgment for costs, 18 cents ; taxing
costs, 18 cents ; and filing papers, 18 cents.   The fee of
25 cents for the order of hearing, 25 cents for the judg-
ment of affirmance, 18 cents for the judgment for costs,
and 8 cents for docketing, are all illegal and unauthorized.
But instead of the two charges of 25 cents and 18 cents
for the two judgments, he had a right to charge 18 only
for the judgment of affirmance, including costs, and the

charge for docketing, should have been made alone against the appellant and charged to him. And in relation to the charge of 75 cents for the *trial*, there seems to be some ambiguity in the statute. The following language is used : for "every trial, including the swearing of the jury and witnesses, and recording a general verdict, 75 cents.

The doubt which arises in the construction of the statute, is whether the fee is allowable in any other case than the case of a trial by jury. But we are inclined to the opinion, that the statute applies to all common law trials in which a jury is sworn or witnesses examined, and that the words "including the swearing of a jury," &c. were not intended to confine the charge to such trials only. We are brought to this conclusion, from the fact that a common law trial, other than a trial by jury, may require the swearing of witnesses, and there seems to be no separate specific charge in the statute for this service. So that the Clerk is allowed no fees for this often very onerous service, unless he be allowed to charge 75 cents for the trial which embraces it.

In the case of Smith *vs.* Russell, on an appeal at the May term, 1838, there are charges for certificates of supercedeas to the Justice and Constable, 25 cents each. The charge for the certificates to the Justice and Constable, are both illegal.

At the November term, 1842, for a single entry in noting on the record the report of reviewers, who had been appointed to view a public road on the motion of Edward Oldham, and noting the appearance of Hunt and others through whose land the road ran, and the motion of Payne and Hunt for a writ of *ad quod damnum*, and the consent of Oldham and Todd, for the road to be established, and another single entry in noting the return of the writ by the jury at the December term following, and the continuance of the cause on account of there not being a majority of the Justices present, the following charges are made, and the following fee bill was issued, and the amount collected from Edward Oldham :

"Nov. 1842. Order on return of the report of viewers, 25 cents; order report received, 25 cents ; recording

COMMONWEALTH
*vs* .
RODES.

The fee of 75 cents allowed to Clerks for trial, applies to all cases in which a jury is sworn or witnesses examined, and no other.

No fee is allowed to Clerks for certificate to Justice and Constable in cases of appeal to Court of supercedeas.

COMMONWEALTH
*vs*
RODES.

same, 75 cents; order appearance entered, 25 cents; order writ of *ad quod damnum* awarded to Payne and Hunt, 25 cents; writ, 50 cents; order where jury to meet, 25 cents; order summons waived, 25 cents; order consent of Oldham, &c. 25 cents; order on return of jury, 25 cents; continuance, 25 cents; order there was not a majority of Justices, 25 cents;—$3 75.

Order for viewing way for public road, writs of *ad quod damnum,* &c. are ex-officio services, and no fee is chargable *vs* individuals if road established.

Many of these charges would not only have been grossly and palpably illegal, as is obvious from what has already been said, if the two entries made had been in a case for which fees might have been charged, and others would have been erroneous, as improperly charged to the applicant or plaintiff in the motion; but the whole service, so far as services were rendered at the instance of the applicant, if the road was established, was a public service, and intended for the benefit of the public, and is embraced in the allowance made to him for his *ex officio services*, as is provided by the act of 1828, (1 *Stat. Laws,* 689.)

Numerous fee bills are exhibited under the specifications in the information, for services rendered in taking the acknowledgment of and recording deeds.

The fee for receiving proof or acknowledgm'nt of a deed, including *land* and *slaves*, and recording is $1 00, and additional charge of 75 cts. for the slaves is not warranted.

We find that where land, slaves, and personalty are all embraced in the same deed, that the defendant has been uniformly in the habit of charging $1 for the land, 75 cents for the slaves, and 75 cents for other pensonalty, in the same manner as if separate deeds had been acknowledged and recorded for each parcel of property. This charge is also illegal and unwarranted. He can only charge the highest fee, or fee of $1, where all are embraced in the same deed. The statute only allows for the whole service of taking the acknowledgment or proof of a deed of conveyance of slaves *or* personalty, and *recording* the same with the *certificate*, the sum of 75 cents, and allows nothing in addition to the charge of $1, for recording and certifying a deed of conveyance for land, on account of slaves or personalty being embraced in the same deed.

Clerks, as such, are not permitted to charge a

The defendant seems also to have been in the habit of charging as Clerk, for extra services rendered in taking the acknowledgment or relinquishment of dower out of

his office. He is not bound to go out of his office to render the service, but if he does, he has no right, under color of his office, to charge or issue his fee bills for such additional service. If he does perform extra services at the instance and request of an individual, he must rely upon a *quantum meruit,* and perhaps upon a special contract, for his compensation. We will pursue this disagreeable subject no further. But would barely remark that there are many fee bills that have been laid before us, running through a series of years, of the same character, and equally objectionable with those that we have noticed. Indeed it is much more difficult to find a fee bill that is right than one that is wrong, if indeed any single fee bill that we have noticed, can stand the test of legal scrutiny in every item.

As the result of the investigation we have made of the facts exhibited in support of the specifications, under the second charge, the question arises, is the defendant guilty of the offence of extortion and removable from office? Though a single illegal charge, or several illegal charges, where there was a plausible pretext for making them, might be ascribed to inadvertence, mistake, or an honest misinterpretation of the statutes regulating the fees, yet we have no doubt that the habitual practice of charging and exacting illegal fees, knowingly and wilfully, under color of official right, is a gross and palpable offence, which amounts to a marked misbehavior in office, and which demands the removal of the Clerk who is guilty. And as all Clerks must be presumed to know the law which prescribes their duties and fixes their fees, the intention, purpose, and fraudulent and selfish design, in the illegal exaction, must be presumed from the illegality of the fees charged, rising in strength and conclusiveness, by the number, continuance, and destitution of plausible pretext for the illegal exactions.

Testing this case by these rules, and it follows that the defendant is guilty of the second charge.

But independent of the presumption which rests upon the ground stated, there are facts in the case in relation to the defendant's charges in the emancipation cases, which bring home to his personal knowledge the illegality

COMMONWEALTH
*vs*
RODES.

fee for going out of their offices to take acknowledgments privy examinations, &c.

Though a Clerk who has been guilty of a single illegal charge, with a plausible pretext therefor, might be excused, yet the habitual practice of charging and extorting illegal fees under color of official right, amounts to such misbehavior in office as to demand a removal from office.

of his charges, and indicate a determined purpose in making them, and stratagem and devise in avoiding responsibility on account of them.

His fee bills containing precisely similar items, in many particulars, with the illegal items of fees by which the aggregate of his charges in this case, are shown to have been made up, were laid before this Court and copied into the opinion when he was before tried for misbehavior in office, in 1833, and his fee bill severely condemned by one Judge, and denounced as sufficient cause alone for his removal, and his removal for that cause not concurred in by another member of the Court, upon the alledged ground only, that the orders of Court were not produced, and upon the same ground, together with his general good character, which was proven in that case but not in this, he escaped the condemnation of the then Chief Justice, and conviction by the whole Court. Prior to that time, as before stated, he had been in the habit of issuing his fee bills and charging his fees in his fee book, to the emancipator, as in all other cases. Since that time he has issued no fee bills, nor charged any fees in such cases in his fee book, though it is his invariable practice to do both in all other cases. But since then he claims the fee from the emancipated person, and demands payment of a gross sum, taking care to give no receipt specifying the items of charge.

We cannot shut our eyes so close as not to see the object and purpose of this sudden and continued change in the defendant's practice. His fee bill containing the items of his charges, had well nigh produced his overthrow. He was determined that his fee bills should not be again brought up in judgment against him in this Court, nor be laid before the Circuit Judge for his inspection and condemnation. Nor should either tribunal be furnished with the evidence of the items of his charges, from his book or receipts; nor should the ignorant emancipated slave be furnished with an opportunity to lay his receipt before some more intelligent person, who could inspect the items and point him to his remedy. By this stratagem he has succeeded for ten years, in exacting illegal fees similar to those for which his fee bill was con-

demned by this Court, and in amount nearly double of that which he had a right to charge, without detection.

And here it may be remarked, that his predatory exactions from individuals, by little and little, adds strength to the presumption of wilful intention, in his abstractions from the Treasury enumerated in the first charge. Though the amounts withheld, exacted, and pocketed from each, when separately considered was small, when added together and accumulated through a series of years, they amount to a very large sum. Nor has he been able to produce a single satisfactory countervailing circumstance to palliate or rebut the presumptions against him, not even good general character, which has great weight in all penal prosecutions, and should have great weight in, this, in repelling the presumption of corrupt purpose and intention, and no doubt had great weight, and most likely caused his acquittal in the former prosecution, has not been proven or attempted to be proven in this case, and the omission of such important proof, in the hands of his able counsel, can be accounted for upon no other principle than inability to establish it by the proof of his neighbors.

It has been urged, and we are aware that the statutes against illegal charges by Clerks, are highly penal, and the preceedings to condemn the fee bill and fine the Clerk for each illegal item summary, and those who may be wronged should be left to that remedy. It was not seriously urged that that remedy should exonerate the offender from a prosecution and removal from office for such an offence. Such conduct amounts to misbehavior in office of the highest grade. And indeed the Legislative denunciations against the offence, indicate their estimate of its character and crying enormity. The penalties imposed, as appears by the facts shown in this case, are wholly insufficient to check and restrain the evil. The mass of the people are ignorant of the fees which the Clerk has a right to charge, and looking upon him as an accredited public officer, they take for granted that what he charges is right. And those who know better, preferring peace to controversy, and disliking to present themselves in the odious attitude of a *quasi* informer, by lay-

ing his fee bills betore the Judge, choose rather to submit to the payment of the small sums illegally exacted.

Upon the whole, without pursuing this enquiry further, we are perfectly satisfied that the defendant is guilty of the second charge.

III. The defendant is charged with making a false entry in the order book, without and against the authority and directions of the County Court, and with altering the report of a surveyor of a road, with the view of furnishing himself with the pretext for the false entry.

It appears from the proof that Stevenson, who was surveyor of the Russell road, had made a report to the levy Court, that he had impressed from different individuals and used for stated periods, on the public road, oxen, carts, &c. with a view to the allowance in the levy of compensation to each of those individuals. That among others he reported that W. Rodes' oxen and cart were used two days, and the sums allowed were set down by or under the order of the County Court, on the margin of the report, and the sum of $4 25 cents allowed to W. Rodes, and the accounts passed by the Court, and the word "passed," in the hand writing of the Clerk, endorsed on the report. After the business of the levy was completed, the Court adjourned, and the orders were made up that night by the deputy, under the instruction of the defendant, who sat by and gave out the items allowed, and directed the item of $4 25 cents allowed to W. Rodes, to be entered in favor of J. C. & W. Rodes, which was done, and the orders signed the next morning by the Court, without being read, or any intimation made to the Court that the entry had been made contrary to their directions. It appears further, that there was a violent legal controversy then pending in chancery, in the Circuit Court, between defehdant's brother' W. Rodes, and himself, in which it was contended by the latter that there was a partnership then existing between them in the farm on which W. Rodes resided. and in the oxen, carts and other articles of stock and personalty upon the farm, which was strenuously controvertod by W. Rodes, and that seemed to be the main matter in contest between rhem. It further appeared in proof, that after the report of the sur

veyor had passed from his hands, that a small *m* was added, in a different hand writing from that of the surveyor, to the initial letter W., so as to make the name-in whose favor the account had passed, read Wm. Rodes, and no person had noticed the letter when the account passed, nor was it observed by any one until some month or more afterwards, the report being, in the mean time, in the custody of the defendant and his deputy. At a subsequent term, Waller Rodes moved the Court to correct the allowance entered on the order book, alledging as a reason, if it stood it might be relied on as a record recognition of the partnership. The defendant being called upon by the Court to show cause why the entry was so made, stated in substance, that he knew that the oxen and cart had been used on the Russell road of which Stevenson was surveyor, and that there was no such person as Wm. Rodes living on the same, and that there must have been a mistake in reporting the account in favor of Wm. instead of Waller Rodes, and the oxen and cart having been obtained from Waller Rodes, that he himself had an equal interest as partner in the oxen and cart, and had, therefore, directed his deputy to make the entry in favor of himself and W. Rodes, as it was made.

From the facts stated, it is obvious that he was guilty of making a *false entry* upon the order book, variant from the directions of the Court, and that upon his own mere will, without consulting or asking the leave of the Court, or communicating to it the change which was made. For this false entry, independent of any bad motive, it might be well questioned whether he ought not to be removed from office. But there are circumstances in the case which strongly lead to the conclusion that the false entry was made with the fraudulent design of making record evidence for himself, of the continuance of the partnership between himself and Waller Rodes, as well as securing to himself, without further proof, the one half of the amount allowed. There is also good grounds to authorize the presumption that he added the *m* to the initial W. in the report, to furnish himself with the pretext to make the false entry, and his excuse to the Court strongly indicates the fact. Besides, the paper was in his custody from the

For a Clerk to change an account and make an entry allowing a claim to himself and another, to whom it was not allowed by the County Court in laying the levy, with the fraudulent design of making evidence for himself and benefitting himself, is misbehavior in office.

time it passed the Court, and that of his deputy, who swears that he did not alter it, nor did he notice the additional *m* for a month afterwards, when his attention was directed to it by the counsel of W. Rodes; and no one had any motive or interest in making the alteration but himself, and he had a motive and interest in affording himself the pretext for the false entry, as given by him promptly in his excuse to the Court.

Without pressing the enquiry further, we must say, that we are satisfied that the defendant is also guilty of the offence specified in the third charge.

In conclusion we would say, that however much this Court may regret the unpleasant task, it is their duty to pronounce the judgment of the law; and believing as we do, that the defendant has been guilty of the three offences charged, of embezzlement, extortion, and making a false entry for a sinister purpose, either of which is such misbehavior in office as demands his removal, we feel constrained to pronounce against him the judgment of eviction from office.

Wherefore, it is considered and adjudged by this Court, that the defendant, James C. Rodes, Clerk of the Fayette County Court, for breaches of good behavior in his said office, in the embezzlement of the public moneys, in the exaction of illegal and unauthorized fees under color of his office, and in making a false entry on his order book, for a sinister purpose, be, and he is hereby removed from his said office of Clerk of the Fayette County Court, the members of this Court concurring unanimously in the sentence.

*Cates, Attorney General, Morehead & Reed and Woolley* for Commonwealth : *Robertson and Crittenden* for defendant.